UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VINCE DEMARIA,

                                        Plaintiff,

                    -v-

NEW YORK STATE UNIFIED COURT SYSTEM *and*
NEW YORK STATE OFFICE OF COURT
ADMINISTRATION,

                                        Defendants.

---

23 Civ. 3627 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case involves an employee's claims that he was wrongfully terminated from city

employment based on a sincere and religious-based refusal to be vaccinated against COVID-19.

Plaintiff Vince DeMaria, a senior court clerk in the New York City Civil Court, sues his former

employers, the New York State Unified Court System ("UCS") and the New York State Office

of Court Administration ("OCA," and collectively, "defendants").  He brings claims under

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq.*, for failure to

accommodate and disparate treatment.

The Court earlier denied defendants' motion to dismiss.  Dkt. 14.  Pending now are cross-

motions for summary judgment.  Defendants move against both claims.  DeMaria moves for

partial summary judgment on two discrete issues implicated by his failure-to-accommodate

claim.

For the reasons that follow, the Court (1) grants in part and denies in part DeMaria's

motion for summary judgment on issues implicated by the failure-to-accommodate claim;

(2) denies defendants' motion for summary judgment on the failure to accommodate claim; and

(3) grants defendants' motion for summary judgment on the disparate treatment claim.

## I.    Background[1]

The Court assumes familiarity with the case's factual and procedural background, which is set out in detail in *DeMaria v. New York State Unified Ct. Sys.*, No. 23 Civ. 3627 (PAE), 2024 WL 1076543, at *1–3 (S.D.N.Y. Mar. 12, 2024).  The following summary is limited to the facts necessary to resolve the discrete issues presented here.

---

[1] This account is drawn from the parties' submissions on these motions, including: defendants' memorandum of law in support of their summary judgment motion, Dkt. 64 ("Defs. Br."); plaintiff's memorandum of law in opposition, Dkt. 71 ("Pl. Opp. Br."); plaintiff's memorandum of law in support of his partial summary judgment motion, Dkt. 67 ("Pl. Br."); defendants' memorandum of law in opposition, Dkt. 70; the declarations of Justin A. Barry, Dkt. 63-1 ("Barry Decl."), Mindy Jeng, Dkt. 63-2 ("Jeng Decl."), Pedro Morales, Dkt. 63-12 ("Morales Decl."), and Jack R. Spitz, Dkt. 67-1 ("Spitz Decl."), and a supplemental declaration by Spitz, Dkt. 71-1, each with attached exhibit(s); the parties' joint stipulated facts, Dkt. 62 ("JSF"); defendants' Local Rule 56.1 Statement, Dkt. 65; plaintiff's Local Rule 56.1 Response Statement, Dkt. 72; plaintiff's Local Rule 56.1 Statement, Dkt. 68; defendants' Local Rule 56.1 Response Statement, Dkt. 69.  Because each party has filed a Rule 56.1 Statement in connection with its motion, the Court, for clarity in citation, identifies the applicable 56.1 statement.

Citations to a party's 56.1 Statement or 56.1 Response Statement incorporate by reference the documents cited therein.  *See, e.g.*, *Kesner v. Buhl*, 590 F. Supp. 3d 680, 683 (S.D.N.Y. 2022), *aff'd sub nom. Kesner v. Dow Jones & Co., Inc.*, No. 22-875, 2023 WL 4072929 (2d Cir. June 20, 2023).  Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

2

### A.    Factual Background

#### 1.    The Parties

DeMaria is a senior court clerk employed by UCS.  JSF ¶¶ 5, 32.  He was appointed and assigned to New York City Civil Court on June 23, 1997, *id.* ¶ 4, and was terminated on August 4, 2022, *id.* ¶ 27.  He was reinstated on May 7, 2024.  *Id.* ¶ 32.

UCS is the judicial branch of the New York state government.  *Id.* ¶ 1.  OCA is the administrative arm of UCS.  *Id.* ¶ 2.

#### 2.    Facts Underlying DeMaria's Claims

On August 23, 2021, in response to the COVID-19 pandemic, the chief administrative judge of New York courts announced that UCS would be implementing a mandatory vaccination program ("Vaccine Mandate").  *Id.* ¶ 9.  On September 10, 2021, UCS announced that personnel would be required to be vaccinated against COVID-19 by September 27, 2021, unless otherwise approved for an exemption "due to medical reasons or a sincerely held religious belief."  *Id.* ¶¶ 10–11.  To implement this program, UCS formed a vaccination exemption committee ("the Committee")[2] to review and resolve religious and medical exemption requests.  *Id.* ¶ 12.

On March 29, 2022, DeMaria applied to UCS for an exemption from the Vaccine Mandate, citing "religious grounds."  *Id.* ¶ 19.  In an accompanying letter, he objected to the use of fetal cell lines development of the COVID-19 vaccine, stating that the "use of derivative biological material from such a grievous act as abortion is contrary to [his] sincerely held religious beliefs and practices."  Spitz Decl., Ex. 2 ("3/31/22 Pl. Exemp. Req. Letter").

On April 28, 2022, the Committee sent DeMaria, via email, a supplemental affidavit, requesting additional information concerning his past and anticipated practice of using specific

---

[2] Unless otherwise stated, references to the Committee are solely as to its voting members.

medications and vaccines that have been tested on fetal cell lines.  Jeng Decl., Ex. D ("4/28/22

Defs. Supp. Affidavit Email") at 1–9.  In it, the Committee "summarize[d] the current medical

and scientific information regarding the COVID-19 vaccines and their development," aimed at

addressing DeMaria's concern about the "connection between fetal cells and the development of

the COVID-19 vaccines."  *Id.* at 4.  Specifically, it provided "statements of fact on the use of

fetal cell lines in the development of COVID-19 vaccines":

> Fetal cell lines are not the same as fetal tissue (tissue obtained from a human
> embryo or fetus).  Fetal cell lines are cells that grow in a laboratory.  Historical fetal
> cells lines were derived in the 1960s and 1970s from two elective abortions. . . .
> and were not done for the purpose of vaccine development. . . .  Current fetal cell
> lines are thousands of generations of duplication removed from the cells extracted
> from fetal tissue.  Fetal cell lines are widely used in cancer research, vaccine
> development, and drug testing.
>
> COVID-19 vaccine developers Moderna, Pfizer, and Johnson & Johnson/Janssen
> used two fetal cell lines in testing or manufacturing their vaccines—HEK-293, a
> kidney cell line that was isolated from a fetus in 1973 from either a spontaneous
> miscarriage or an elective abortion, and PER.C6, a retinal cell line that was isolated
> from an aborted fetus in 1985.
>
> While fetal cell lines were used to develop or manufacture these COVID-19
> vaccines, *no aborted fetal cells are in the vaccines themselves*. . . .
>
> Newly aborted fetal tissue is not used to generate HEK-293 or PER.C6 cells, to
> modify these cell lines, or to maintain them in a laboratory.  The use of HEK-293
> and PER.C6 cell lines *does not necessitate or create demand for future abortions*.

*Id.* (emphasis in original).  It then requested DeMaria's signed attestation that, after having

reviewed the listed facts, "taking *any* of the COVID-19 vaccines would violate [his] sincere

religious beliefs due to their connection to fetal cell lines in either testing or production."  *Id.*

(emphasis in original).

The affidavit also listed "common pharmaceutical products that have been tested

using . . . *the same fetal cell* lines used in the testing of the Moderna and Pfizer COVID-19

vaccines," such as over-the-counter drugs, including Tylenol and Advil; prescription drugs,

4

including certain cholesterol-lowering statins; and various vaccines, including those for measles, mumps, rubella ("MMR"), and chicken pox. *Id.* at 5 (emphasis in original). It requested that DeMaria attest whether he had "ever used any of the products listed," including whether he had within the last two years and whether he would in the future. *Id.*

On May 6, 2022, DeMaria submitted the sworn affidavit, averring that taking any of the COVID-19 vaccines would violate his "sincere religious beliefs due to their connection to fetal cell lines." Spitz Decl., Ex. 7 ("5/6/22 Pl. Supp. Aff.") at 1. He also affirmed that he had used certain of the listed over-the-counter drugs within the last two years and had received the MMR and chicken pox vaccines. *Id.* at 2–3. As to future use of the listed over-the-counter drugs, DeMaria responded that he would not use them, even if recommended or prescribed by a physician, but added, by hand, "not if similar circumstances were present." *Id.* at 2. As to his earlier vaccinations, DeMaria affirmed that, having learned that the MMR and chicken pox vaccines used the same "or other fetal cell lines in production and/or testing," it would "violate [his] religious beliefs to now receive" them, adding, by hand, "[i]f similar circumstances were present." *Id.* at 3.

On June 8, 2022, the Committee sent DeMaria a letter asking him to clarify his use of the phrase, "if similar circumstances were present." Spitz Decl., Ex. 8 ("6/8/22 Def. Clarif. Req. Letter"). The next day, DeMaria responded, by letter:

> To clarify my statement, "if similar circumstances were present", I mean, if similar circumstances regarding development and manufacturing processes were present or exist between the products included in the pharmaceutical products list and the Covid vaccinations, (namely-the use of fetal cell lines), then my objection and sincerely held religious belief regarding their consumption is the same.

*Id.*, Ex. 9 ("6/9/22 Pl. Clarif. Letter") (quoted verbatim, including quotation marks, from exhibit).

On June 23, 2022, the Committee—comprised of six lawyers and two non-lawyers—denied DeMaria's request for an exemption. JSF ¶¶ 21–23. It directed him, by July 8, 2022, to submit proof of vaccination against COVID-19. *Id.* ¶ 21. DeMaria did not provide proof of vaccination by that deadline. *Id.* ¶ 24.

On July 12, 2022, UCS "(i) informed [DeMaria] that he was not in compliance with the mandatory vaccination program, (ii) directed him to provide proof of vaccination against COVID-19 by July 26, 2022, and (iii) stated that in the event he failed to provide proof of vaccination he would be terminated." *Id.* ¶ 25. DeMaria did not provide proof of vaccination by the July 26, 2022 deadline. *Id.* ¶ 26.

On August 4, 2022, UCS terminated DeMaria. *Id.* ¶ 27.

### 3. DeMaria's Later Reinstatement

On February 17, 2023, UCS discontinued the Vaccine Mandate and announced that "all persons terminated for failing to comply with the mandatory vaccination program would be permitted to submit a request for reinstatement." *Id.* ¶ 29. On April 20, 2023, UCS informed DeMaria of the procedure for making a request for reinstatement. *Id.* ¶ 30. On February 28, 2024, UCS requested DeMaria's reinstatement to his position. *Id.* ¶ 31.

On May 7, 2024, UCS reinstated DeMaria to the position of senior court clerk and assigned him to New York City Civil Court. *Id.* ¶ 32. Apart from two months of unemployment benefits, the reinstatement did not award DeMaria backpay or benefits for the period between his termination and his reinstatement.[3]

---

[3] DeMaria, in his responses to defendants' interrogatories, affirmed that he received "backpay while searching for commensurate re-employment," between August 4, 2022, and October 2022. Morales Decl., Ex. C ("DeMaria's Interrogatory Responses") No. 6.

### B.    Procedural History

On May 2, 2023, DeMaria filed an initial complaint.  Dkt. 3 ("Compl.").  On July 31, 2023, defendants moved to dismiss based on the *Colorado River* abstention doctrine, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), Dkt. 8, and filed a memorandum of law in support, Dkt. 9.  On August 18, 2023, DeMaria opposed the motion. Dkt. 11.  On August 28, 2023, defendants replied.  Dkt. 12.  On March 12, 2024, the Court denied defendants' motion to dismiss.  Dkt. 14.  On March 26, 2024, defendants filed an answer. Dkt. 18.

On February 21, 2025, the parties completed discovery.  On April 9, 2025, the Court held a conference and set a briefing schedule for summary judgment motions.  Dkt. 61.

On April 25, 2025, the parties filed their joint statement of material facts.  Dkt. 62.  On May 16, 2025, defendants filed a motion for summary judgment and supporting materials, Dkts. 63–65, and DeMaria filed a motion for partial summary judgment and supporting materials, Dkts. 66–68.  On May 30, 2025, each side filed oppositions to the other's motion. Dkts. 69–70 (defendants), 71–72 (DeMaria).  On June 13, 2025, each side filed a reply. Dkts. 71–72 (DeMaria), 73–74 (defendants).  On June 17, 2025, the Court heard argument. Dkt. 85 ("6/17/2025 Oral Arg. Tr.").

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact.  In

making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008) (citation omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citation omitted). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

## III. Discussion

Defendants move for summary judgment on both the failure-to-accommodate and disparate treatment claims. DeMaria moves for partial summary judgment on two issues implicated by the failure-to-accommodate claim: that (1) his opposition to receiving the

COVID-19 vaccine was based on a religious belief, and (2) accommodating him would not have imposed an undue hardship on defendants. The Court addresses the failure to accommodate claim first, and then the disparate treatment claim.

### A.    Failure to Accommodate

#### 1.    Legal Standards

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" 42 U.S.C. § 2000e-2(a)(1). The statute directs an employer to "reasonably accommodate" an employee's "religious observance or practice," unless such accommodations would impose "undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

To make out a prima facie failure-to-accommodate claim under Title VII, a plaintiff must show that he: (1) held a bona fide religious belief that conflicted with an employment requirement; (2) informed his employer of this belief; and (3) was disciplined for failing to comply with the conflicting requirement. *See Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). Once an employee establishes a prima facie case, the employer must then show that he was offered "a reasonable accommodation" or that doing so would have caused the employer to suffer an "undue hardship"—an affirmative defense for which the employer bears the burden of proof. *Hale v. Vidal*, No. 22-2973, 2023 WL 7211909, at *2 (2d Cir. Nov. 2, 2023) (citation omitted). An undue hardship is shown "when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).

9

### 2.    Application

In his failure-to-accommodate claim, DeMaria argues that defendants, instead of terminating him, could have reasonably accommodated his religious beliefs, and that doing so would not have imposed an undue hardship on them.  *See* Pl. Br. at 17–21.

The second and third elements of DeMaria's prima facie case are undisputed.  The stipulated facts establish that DeMaria notified his employer of a religious belief that conflicted with a work requirement (that he be vaccinated against COVID-19), JSF ¶ 19, and that he was disciplined (by being terminated) for failure to comply with that requirement, *id.* ¶¶ 25–27.

The parties, however, dispute the first element of the claim: whether DeMaria's basis for resisting the vaccine requirement constituted a bona fide religious belief.  *See* Pl. Br. at 13–17; Defs. Br. at 18–21.  They also dispute defendants' affirmative defense of an undue hardship.  *See* Pl. Br. at 17–21; Defs. Br. at 21–23.  Defendants move for summary judgment against the claim on both grounds, and need prevail on only one for the claim to fail.  DeMaria acknowledges that the first step in establishing a bona fide religious belief—whether his stated belief is sincere— presents a factual dispute that cannot be resolved at summary judgment.  *See* Pl. Br. at 13. However, he asks the Court to grant summary judgment in his favor on the second—that his stated belief is religious in nature.  *See id.* at 13–17.  He also asks the Court to enter summary judgment against defendants on their undue hardship defense.  *See id.* at 17–21.

#### a.    *Bona fide religious belief*

Whether a person holds a bona fide religious belief implicates two issues: (1) "whether the beliefs professed by [plaintiff] are sincerely held" and (2) "whether they are, in [plaintiff's] own scheme of things, religious."  *See Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) (citing *United States v. Seeger*, 380 U.S. 163, 185 (1965)).  As discussed, the parties' cross- motions concern different elements.  Specifically, DeMaria pursues summary judgment on

whether his stated beliefs were "religious." *See* Pl. Br. at 13–17.[4]  Defendants, in turn, pursue

summary judgment on the ground that DeMaria's stated belief was not "sincerely held." *See*

Defs. Opp. at 14–17.  The Court addresses each in turn.

i.    Whether DeMaria's beliefs were religious

A religious belief "occupies a place in the life of its possessor parallel to that filled by the

orthodox belief in God." *Seeger*, 380 U.S. at 166.  Such a belief need not "contemplate an

orthodox or traditional God," *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir.

1988) (citing *Seeger*, 380 U.S. at 166), or be "acceptable, logical, consistent, or comprehensible

to others," *Equal Opportunity Emp. Comm'n v. United Health Programs of Am., Inc.*, 213

F. Supp. 3d 377, 395 (E.D.N.Y. 2016) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450

U.S. 707, 714 (1981)); *see also Stevens v. Berger*, 428 F. Supp. 896, 899 (E.D.N.Y. 1977)

("[p]opularity, as well as verity, are inappropriate criteria," when assessing religious beliefs, as

even those that appear "to every other member of the human race preposterous" may merit

protection).  *But see Rivera v. Choice Courier Systems, Inc.*, No. 1 Civ. 2096, 2004 WL

1444852, at *5 ("A person's 'intellectual' concerns, however, are not safeguarded." (quoting

*Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440 (2d Cir. 1981))).

As the Supreme Court has recognized, "determin[ing] . . . what is a 'religious' belief or

practice is more often than not a difficult and delicate task." *Thomas*, 450 U.S. at 714.  Courts

therefore rightly proceed with caution in making factual assessments of this nature. *See Patrick*,

745 F.2d at 158 (an adherent's claim that his belief "is an essential part of a religious faith must

---

[4] Under Rule 56(g), the Court may grant partial relief on a discrete issue as to which there is no
genuine dispute of material fact.  *See, e.g.*, *Janssen Scis. Ireland Unlimited Co. v. TLC Xpress
Pharmacy Inc.*, No. 22 Civ. 1983, 2025 WL 974299, at *2 (E.D.N.Y. Apr. 1, 2025); *Alessi
Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 486 (S.D.N.Y. 2022); *Sicom
S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 705 (S.D.N.Y. 2016).

be given great weight" (quoting *Seeger*, 380 U.S. at 184)); *Rivera*, 2004 WL 1444852, at *5

("Courts 'must avoid any test that might turn on the fact finder's own idea of what a religion

should resemble.'" (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 482 (2d Cir.

1985)); *Sherr v. Northport–E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y.

1987) ("Defining 'religion' for legal purposes is an inherently tricky proposition.").  Courts have

dismissed claims of a religiously grounded belief to this effect only where the evidence exposed

the claim as clearly contrived.  *See, e.g.*, *Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414,

429 (E.D.N.Y. 2010) (denying preliminary injunction for plaintiffs who "sincerely and genuinely

oppose[d] vaccinations," but "failed to prove the[ir] objections [we]re 'religious' in nature,"

noting that their church did not "in any way express[] opposition to vaccination," and that their

objections were based on concerns that vaccines "may not be safe," "may be harmful[,] and may

cause autism," as well as their "reluctance to have unnecessary marks on their bodies," which are

"personal rather than religious fears"); *Beickert v. N.Y.C. Dep't of Educ.*, No. 22 Civ. 5265, 2023

WL 6214236, at *3–4 (E.D.N.Y. Sept. 25, 2023) (at motion to dismiss stage, holding that

plaintiff's "mere invocation of a biblical verse" did not overcome reality that her "non-

compliance with the Vaccine Mandate rests on her desire for COVID-19 vaccines to be subjected

to 'longer term testing . . . to ensure that the currently available COVID-19 vaccines are truly

safe and effective and will not adversely affect [her] health'" (citing *Mason*, 851 F.2d at 51)).

     It is undisputed that DeMaria's reason for resisting the vaccine, as he articulated it, was

religious in nature.  *See* Pl. Br. at 13–17; Defs. Br. at 18–21.  But the parties dispute whether, in

fact, DeMaria's objection to the vaccine genuinely derived from religious convictions, as he

claims, as opposed to other concerns or impulses, as defendants argue.  *See id*.  In this respect,

the inquiry into whether DeMaria's objection was "religious" in nature significantly overlaps

with the disputed issue of whether his religious belief was "sincerely held."  Courts entertaining

exemption claims based on religious beliefs have often noted this overlap.  *See, e.g.*, *Gardner-*

*Alfred v. Fed. Rsrv. Bank of New York*, 143 F.4th 51, 67 (2d Cir. 2025) ("We are mindful of the

judiciary's incapacity to judge the religious nature of an adherent's belief, as well as the

difficulties that plaintiffs face in offering evidence that their religious beliefs are sincerely held."

(citation omitted) (cleaned up)); *Barber*, 650 F.2d at 441 ("[I]t is frequently difficult to separate

[a sincerity] inquiry from a forbidden one involving the verity of the underlying belief." (citing

*United States v. Ballard*, 322 U.S. 78, 92–95 (1944) (Jackson, J., dissenting))); *Sughrim v. New*

*York*, 690 F. Supp. 3d 355, 378 (S.D.N.Y. 2023) ("An analysis of sincerity in the religious

exercise context is exceedingly amorphous, and courts have suggested that such an analysis may

understandably appear to overlap with the test for what is religious inasmuch as that test

examines the private and subjective." (quoting *Patrick*, 756 F.2d at 157, and *United States v.*

*Manneh*, 645 F. Supp. 2d 98, 111 (E.D.N.Y. 2008)) (cleaned up)).  As such, courts have noted,

evidence bearing on sincerity—for example, whether the plaintiff's behavior in resisting a

particular practice has been consistent—may also speak to whether the objection is religiously

grounded, as opposed to political, ideological, situational, or impulsive.  *See, e.g.*, *Matos v.*

*Discovery Commc'ns, LLC*, 750 F. Supp. 3d 307, 322 (S.D.N.Y. 2024) (a plaintiff could "point[]

to other practices 'consistent' with her objection to vaccination, including that she has

'maintained her devout Christian ideals and refrained from ingesting any pharmaceuticals,'" to

show that her objection is based on a "conflicting religious belief"); *Caviezel*, 701 F. Supp. 2d

at 430 ("[T]he fact that [plaintiff] had her first three children vaccinated is evidence of no

religious problem on those occasions. . . .  [T]he Court finds that her reluctance to have her

daughter vaccinated does not arise from a religious belief, but from a personal, moral or cultural feeling against vaccination[.]").

On the Court's review, the assembled evidence would permit a reasonable juror to find for either side on whether DeMaria acted out of religious conviction. There is ample evidence on which a jury could find for DeMaria. For one, DeMaria so testified. In his deposition, he stated that he depends on the Holy Spirit to "lead [him] in encouraging and providing really good service," Spitz Decl., Ex. 1 ("Pl. Depo. Tr.") at 173,[5] and that upon being "made aware of a sin according to God's word, it is [his] obligation to resist it," *id.* at 250. He testified that, in his view, it would be a sin to use a vaccine that derived from fetal lines: "Abortion is a sin throughout Scripture. Murder of an innocent life . . . is a grave sin." *Id.* at 248. He also affirmatively responded that "to receive a COVID-19 vaccine would be to sin." *Id.* A jury could credit this testimony. A jury could also put weight on DeMaria's explanation in the letter he submitted to the Committee in support of his exemption request. There, he stated that his faith "directs all" of his "choices and actions" and is "who he is." 3/31/22 Pl. Exemp. Req. Letter. He cited Bible scriptures and stated that his pro-life beliefs stemming from "the inherent Word of God," equating abortion to murder, inhibited him from taking the COVID-19 vaccine. *Id.* Consistent with this, the case law by now has widely recognized that objections to vaccines with a connection to fetal cell lines may, in particular cases, derive from the objector's religious convictions. *See, e.g.*, *Gardner-Alfred*, 143 F.4th at 67 (vacating summary judgment and remanding as to one plaintiff's claims, holding that "a reasonable jury could find that [plaintiff] believed the Covid-19 vaccines were developed through the use of aborted fetal cells and that

---

[5] Because neither party submitted a complete transcript of DeMaria's deposition—or of any other—citations in this opinion to depositions refer to the printed page numbers of the transcripts, not the ECF-generated page numbers.

taking such a vaccine would contravene her religious beliefs"); *Matos*, 750 F. Supp. 3d at 320 (accepting that plaintiff's "particular concern that the vaccines were derived from aborted fetal cells, which any individual Catholic may refuse," could support a religious accommodation claim (citation omitted)); *Grullon v. City of New York*, No. 156934/2022, 2023 WL 1795710, at *3–4, 11 (N.Y. Sup. Ct. Feb. 3, 2023) (granting plaintiff's request for religious accommodation where plaintiff stated that COVID-19 vaccines were "developed using stem cell lines from unborn babies" and that receiving them "would be contrary to his religious beliefs").

On the other hand, a jury could discredit DeMaria's testimony and find that his resistance to the vaccine, although stated in religious terms, was not "itself based on religion." *Matos*, 750 F. Supp. 3d at 322 (citation omitted). A jury so finding could place weight on DeMaria's behavior with respect to other medications that derived from testing using fetal cell lines. Contrary to his claim that his religion made it a sin to take medications that derived from such testing, DeMaria admitted during his deposition that he had used medications such as Tylenol and Advil, which had also been "tested using fetal cell lines." Pl. Depo. Tr. at 45–47; *see also* 5/6/22 Pl. Supp. Aff. at 2. He admitted that he had used Tylenol not only during the two years immediately before the exemption request, but afterwards, including as recently as December 2024, after he had been expressly notified during the exemption process that these medications had derived from fetal cell testing. *See* Pl. Depo. Tr. at 48–50, 64–66, 91, 194–98. DeMaria also admitted to using the cholesterol medication atorvastatin in January 2022, after he had been informed that it, too, had been based on testing using fetal cell lines. *See id.* at 123–28. He testified that he discontinued use of atorvastatin not for religious reasons, but after discussing with his doctor the possibility of "stopping it for a little while to see if that [would] help[]" with nerve pain in his legs. *Id.* at 124–25. In a supplemental affidavit he completed at the

15

Committee's direction after submitting his accommodation request, DeMaria indicated he had previously received other vaccines, including the MMR and chicken pox vaccines, derived from fetal cell lines.  5/6/22 Pl. Supp. Aff. at 3.  A jury giving weight to this evidence could discredit that DeMaria's demurral from the COVID-19 vaccine had anything to do with his religion.  It could conclude instead that his opposition was particular to the COVID-19 vaccine—that whatever the roots were of that opposition, it had nothing to do with a religious conviction that required refraining from use of products derived from fetal cell testing.  *See, e.g.*, *Gardner-Alfred*, 143 F.4th at 69 (affirming entry of summary judgment for defendant where plaintiff "provided no evidence that she has *ever* acted consistently with her professed religious beliefs other than her refusal to get the Covid-19 vaccine" (emphasis in original)); *NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 259 (E.D.N.Y. 2016) (denying preliminary injunction for plaintiff whose inconsistent stances on medicine and religion demonstrated her objections to the Covid-19 vaccine "are substantially health-based, rather than based on sincere and genuine religious beliefs").

There is thus an evidentiary basis on which a jury could find for either party as to whether DeMaria, in refusing the vaccine, acted out of religious belief.[6]  Accordingly, summary judgment on this point, which concerns his motivations, cannot be granted.  *See Gardner-Alfred*, 143 F.4th at 67 ("[A] plaintiff's statements about her religious beliefs can raise a genuine dispute of material fact as to the sincerity of those beliefs.  That unremarkable observation aligns with our hesitance to grant summary judgment where subjective issues regarding a litigant's state of

---

[6] At argument, counsel represented that the notes of the Committee that rejected DeMaria's exemption request reflected a divided panel:  Five members voted to deny the exemption, two voted to grant it, and one abstained.  6/17/2025 Oral Arg. Tr. at 44.  The Committee's lack of unanimity on this point underscores the capacity of reasonable minds to differ on whether DeMaria's claim of an authentic religious belief may be credited.

mind, motive, sincerity or conscience are squarely implicated, and with the general prohibition on assessing credibility or weighing the evidence on summary judgment." (citation omitted) (cleaned up)).  *See generally Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("[I]n a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate." (citation omitted)); *Patrick*, 745 F.2d at 157–60 (similar).

The Court thus declines to grant partial summary judgment to DeMaria on the issue of whether the beliefs on which he refused the COVID-19 vaccine were religious in nature.

ii.    Whether DeMaria's beliefs were sincerely held

Defendants, as noted, seek summary judgment on the ground that DeMaria's stated religious beliefs underlying his refusal to take the vaccine were not sincerely held.  *See* Defs. Br. at 18–21.  For much the same reasons as reviewed above, that issue—which is closely intertwined with the issue of whether these beliefs were religious in nature—cannot be resolved on summary judgment, but requires determination by a jury at trial.

The sincerity analysis "seeks to determine an adherent's good faith in the expression of his religious belief." *Patrick*, 745 F.2d at 157 (citation omitted).  It provides a "rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud," and requires a fact-finder "to delve into the claimant's most veiled motivations." *Id*.  Because this inquiry turns on subjective credibility, it "demands a full exposition of facts and the opportunity for the fact[-]finder to observe the claimant's demeanor during direct and cross-examination." *Id.*  The Second Circuit has noted that an adherent's belief is not "sincere" if the individual acts in a manner "inconsistent with that belief . . . or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind the veil of religious doctrine." *Barber*, 650 F.2d at 441 (citation omitted); *see also Philbrook*, 757 F.2d at 482.

DeMaria offers substantial evidence of the central role Christianity plays in his life.  In his deposition, he testified to being a practicing Christian for more than 23 years, Pl. Depo. Tr. at 162–63, during which he belonged to multiple churches, *id.* at 169; led weekly home prayer groups, *id.* at 170, 175–77; and served as "a leader in the pastoral care ministry," *id.* at 176. After his termination, he testified, he continued to practice his faith by attending and volunteering at church and participating in prayer groups and community outreach.  *Id.* at 174–76.  He also testified that he worked as "a project manager and liaison to a pro-life pregnancy agency," offering prenatal care and alternatives to abortion to pregnant women.  *Id.* at 208–09.  DeMaria described his faith as permeating all aspects of daily life, stating that he is "always praying in [his] mind, even on the job, for people that come in with needs in the court," whether they are "struggling with their gender identity" or "being evicted or sued."  *Id.* at 172. Based on this record, DeMaria argues that his religious beliefs are sincerely held and prevented him from receiving the COVID-19 vaccine, as "the use of derivative biological material . . . from such a grievous act as abortion is contrary to [his] sincerely held religious beliefs and practices." Pl. Br. at 5 (quoting 3/31/22 Pl. Exemp. Req. Letter).

Defendants, however, argue that inconsistencies in DeMaria's behavior undermine the sincerity of his objection.  *See* Defs. Br. at 18–21.  He has used other medications and vaccines derived from fetal cell lines, *see supra*, pp. 14–16, and this, defendants argue, means that his selective objection to the COVID-19 vaccine reflects a "personal preference" rather than a "sincerely held religious belief," Defs. Br. at 21.  DeMaria counters that there is sufficient evidence of the sincerity of his religious beliefs to reach a jury and that his inconsistent behavior raises "[a]t best" an issue of material fact for the jury.  Pl. Opp. Br. at 16–18.

DeMaria has the better argument. Whether his religious beliefs are "sincerely held" is a quintessential factual issue that cannot be resolved at summary judgment. To be sure, courts may consider a person's inconsistent conduct when assessing a claim of religious sincerity, and in the rare case where there is no offsetting evidence, entry of summary judgment for the defense on this ground may be warranted. *See Gardner-Alfred*, 143 F.4th at 67 (affirming entry of summary judgment for defendant where plaintiff "acted inconsistently with her professed religious beliefs," and where her claim was "so wholly contradictory, incomplete, and incredible that no reasonable jury could accept her professed beliefs as sincerely held"); *Barber*, 650 F.2d at 441 ("[A]n adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief[.]" (citation omitted)); *see, e.g.*, *Ventresca-Cohen v. DiFiore*, 225 A.D.3d 9, 13 (3d Dept. 2024) (holding that plaintiffs' "continued and/or contemplated use of other medications or vaccinations tested on fetal cell lines . . . while refusing to take the COVID-19 vaccination on that very basis, reflected an inconsistency undermining the sincerity of [their] religious beliefs"); *cf. Sughrim*, 690 F. Supp. 3d at 378 (employers are "entitled to consider whether a swift change in . . . professed religious faiths after being denied accommodations—or any potential recent inconsistencies in their purported views, for that matter—suggest[] a lack of sincerity").

But where, as is clearly the case here, the record contains evidence supporting the plaintiff's claim to have acted from a sincerely held faith, the conflicting evidence must be resolved by the trier of fact. *See, e.g.*, *Gardner-Alfred*, 143 F.4th at 63–67 (vacating summary judgment and remanding where plaintiff "acted inconsistently with her religious beliefs," because "evidence of [plaintiff's] potentially inconsistent behavior is, at best, impeachment evidence that a jury could rely on to discredit [her] testimony, but it is not, in and of itself, sufficient to support a grant of summary judgment"); *Wilson v. City of New York*, No. 6

Civ. 7777, 2013 WL 3963451, at *5 (S.D.N.Y. Mar. 15, 2013) (denying summary judgment to defendants on sincerity element of plaintiff's Free Exercise claim where he had religious objections to consuming pork but "on a few occasions . . . purchased items in the commissary that contained pork ingredients"), *report and recommendation adopted*, No. 6 Civ. 7777, 2013 WL 3963453 (S.D.N.Y. July 31, 2013).  *See generally Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) ("[C]ompeting inferences (along with any credibility assessments to draw such inferences) cannot be resolved by a court on summary judgment." (citation omitted)); *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989) (similar).

> ### b.    *Undue hardship in accommodating DeMaria*

If the employee is able to make out a prima facie failure-to-accommodate claim under Title VII, the burden shifts to the employer, who "must offer [him or her] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship."  *Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (citation omitted).  An accommodation presents an undue burden when the "accommodation would result in substantial increased costs in relation to the conduct of [an employer's] particular business."  *Groff*, 600 U.S. at 470; *see also Haczynska v. Mount Sinai Health Sys., Inc.*, 738 F. Supp. 3d 300, 321 (E.D.N.Y. 2024) ("Undue hardship is adequately established only when a burden is substantial[.]" (quoting *Groff*, 600 U.S. at 468)).  This inquiry is "fact-specific" and requires courts to "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of [an] employer."  *Groff*, 600 U.S. at 468, 470–71; *see also Conde v. Mid Hudson Reg'l Hosp. Med. Ctr.*, No. 22 Civ. 3085, 2024 WL 168282, at *7 (S.D.N.Y. Jan. 12, 2024).

DeMaria argues that there is insufficient evidence on a which a jury could find this defense established. Defendants argue not only that there is sufficient evidence to support this defense, but that they are entitled to entry of summary judgment based on this defense. On this issue, DeMaria is clearly correct.

The defense makes two arguments in support of its claim that a jury could—and indeed, would have to—find this defense established. Neither is sound.

First, defendants argue that the cumulative cost of accommodating unvaccinated employees amounts to an "undue hardship." *Groff*, 600 U.S. at 470. OCA's executive director, Justin Barry, attested that during the 57-week period between January 10, 2022, and February 15, 2023, 694 unvaccinated employees were subject to weekly COVID-19 testing. Barry Decl. ¶ 58. During that period, he attests, defendants extended "approximately 39,500 paid hours . . . to employees who required testing." *Id.* In addition to paid leave for such tests, Barry notes that defendants sometimes had to pay overtime to other employees to cover for exempt staff or otherwise experienced a reduction in overall task completion. *Id.*

DeMaria counters that the 39,500 testing hours for which defendants provided paid leave is an improper measure of the undue burden because those hours are not attributable to him. *See* Pl. Opp. Br. at 19–21. And he notes that the 694 other employees who were granted exemptions were permitted to continue working unvaccinated under a program that included masking and weekly testing at the employee's own expense. *See id.* at 19 (citing Spitz Decl., Ex. 5 ("Barry Depo.") at 136–37). DeMaria argues that defendants cannot demonstrate that the marginal cost of accommodating him would impose a "substantial cost . . . amounting to an undue burden." Pl. Br. at 19 (citing *Groff*, 600 U.S. at 470).

DeMaria is correct. On this point, *Bergin v. New York State Unified Court System* is instructive. No. 22 Civ. 5264, 2024 WL 4444434, at *4 (E.D.N.Y. Oct. 8, 2024), *cert. of appealability denied*, 2024 WL 4665266 (E.D.N.Y. Nov. 4, 2024). There, the Court found that because UCS had "granted 555 religious accommodation requests (out of 937 applications)," permitting the accommodation sought by the plaintiff would not have presented an undue hardship. *Id.* at *4. It noted, too, that UCS had "rescinded its vaccination policy and, tellingly, reinstated plaintiff to her former position," underscoring the absence of an ongoing burden. *Id.* Similarly here, defendants have not shown "substantial increased costs" or a particularized burden attributable to DeMaria. *Groff*, 600 U.S. at 470. They have not made any individualized assessment of the burden that accommodating DeMaria would have posed, let alone demonstrated that honoring his request for an exemption would have caused "substantial cost" or operational disruption. *Id.* And, as in *Bergin*, defendants ultimately reinstated DeMaria after the Vaccine Mandate was lifted. JSF ¶ 32. Defendants' showing about the burden presented by others who were granted exemptions is insufficient to support an undue burden defense. The Court puts that evidence aside.

Second, defendants argue that accommodating unvaccinated employees, notwithstanding protective measures, poses unacceptable safety risks that constitute an undue hardship. *See* Defs. Br. at 22; *see also* 6/17/2025 Oral Arg. Tr. at 51. They cite *Algarin v. N.Y.C. Health & Hosps. Corp.*, which held that allowing such an employee to work in a healthcare facility presented COVID-related risks sufficient to constitute an undue hardship under Title VII. 678 F. Supp. 3d 497, 511 (S.D.N.Y. 2023), *aff'd*, No. 23-320, 2024 WL 1107481 (2d Cir. Mar. 14, 2024). And they cite *Kizer v. St. Jude Children's Research Hosp., Inc.*, which found that accommodating a remote-work request by the plaintiff, who had cared in-person for immunocompromised patients,

would present an undue hardship, because such work could not be done remotely. 741 F. Supp.
3d 726, 750 (W.D. Tenn. 2024), *aff'd*, 2024 WL 4816856 (6th Cir. Nov. 18, 2024).

These cases are easily distinguished. These and similar cases reflect the distinct problem
of accommodating unvaccinated healthcare or other employees who work directly with highly
vulnerable populations. *See, e.g.*, *Parks v. Montefiore Med. Ctr.*, No. 23 Civ. 4945, 2024 WL
917330, at *3 (S.D.N.Y. Mar. 4, 2024) (risk of exposure to hospital patients who "are
immunocompromised or otherwise vulnerable to severe infection" qualified as an undue
hardship (citation omitted)); *Beickert*, 2023 WL 6214236, at *5 (teacher's unvaccinated presence
posed "a risk to the vulnerable . . . student population," and constituted an undue hardship
(citation omitted)); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22 Civ.
2929, 2023 WL 3467143, at *6 n.7 (S.D.N.Y. May 15, 2023) (allowing unvaccinated nurses to
continue working at a hospital posed an "obvious hardship associated with the increased health
and safety risk posed to other employees and patients" (citation omitted)). Defendants have not
adduced evidence that DeMaria's line of work presented any such issues.

Accordingly, defendants have failed to present evidence that would have enabled a
reasonable jury to find that accommodating DeMaria would have imposed an undue hardship.
The Court therefore grants summary judgment for DeMaria as to the undue hardship defense.
*See, e.g.*, *Bergin*, 2024 WL 4665266, at *4; *Sughrim*, 690 F. Supp. 3d at 380 (granting summary
judgment on this point to plaintiffs "because no reasonable juror could conclude that [defendant]
has experienced, or will experience, undue hardship" by granting religious accommodation); *cf.*
*Chinchilla v. New York City Police Dep't*, No. 23 Civ. 8986, 2024 WL 3400526, at *10
(S.D.N.Y. July 12, 2024) (denying motion to dismiss where "allowing Plaintiff to test and mask,
rather than get vaccinated," did not clearly present an undue hardship).

### B.      Disparate Treatment

Defendants move for summary judgment on DeMaria's disparate treatment claim under Title VII, which alleges that defendants discriminated against him by terminating him on account of his religious beliefs.  The Court grants that motion.

### 1.      Legal Standards

To establish a prima facie case of disparate treatment, a plaintiff must show that: (1) he belonged to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discriminatory intent.  *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

If a plaintiff establishes a prima facie case of disparate treatment using indirect evidence, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).  The plaintiff may then rebut this explanation by showing that it is pretextual.  *See id.*; *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

### 2.      Discriminatory Intent

The first three elements of DeMaria's claim are not seriously in dispute.  He is a practicing Christian whose stated beliefs formed the basis for his exemption request.  He was qualified for his role, in that he worked for UCS for more than two decades—first as a court officer and later, after a promotion, as a senior court clerk—and was rehired after his termination.[7]  JSF ¶¶ 4–5, 31–32.  And his termination for non-compliance with UCS's

---

[7] Defendants argue that DeMaria was not qualified for his position because he failed to comply with the Vaccine Mandate.  *See* Defs. Br. at 16–18.  That argument confuses DeMaria's

mandatory vaccination program was a quintessential adverse employment action. *Id.* ¶¶ 24–27;

*see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (quintessential examples of

adverse employment actions are hiring, firing, and failing to promote)); *Brooks v. Bright*

*Horizons Fam. Sols., Inc.,* No. 24 Civ. 6076 (PAE), 2025 WL 1796995, at *9 (S.D.N.Y. June 26,

2025) ("Termination and non-promotion are paradigmatic adverse employment actions under the

McDonnell Douglas framework." (citation omitted)).

      Defendants move for summary judgment on the fourth element: whether DeMaria's

termination occurred under circumstances giving rise to an inference of religious discrimination.

That element can be established "by direct evidence of intent to discriminate" or, as is more

common, by "showing circumstances giving rise to an inference of discrimination." *Bart v.*

*Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) (citation omitted), *cert. denied sub nom. The*

*Golub Corp. v. Elaine Bart*, 145 S. Ct. 173 (2024); *see also Holcomb*, 521 F.3d at 137 ("Where

an employer has acted with discriminatory intent, direct evidence of that intent will only rarely

be available[.]" (citation omitted)).

      Direct evidence of discriminatory intent may consist of an employer's "remark or action

[that] directly reflects a discriminatory attitude." *Venezia v. Luxoticca Retail N. Am. Inc.*, No. 13

Civ. 4467, 2015 WL 5692146, at *3 (S.D.N.Y. Sept. 28, 2015) (citation omitted), *aff'd*, 699

F. App'x 53 (2d Cir. 2017).  It may also take the form of a "workplace policy, practice, or

decision that relies expressly on a protected characteristic." *Young v. United Parcel Serv., Inc.*,

575 U.S. 206, 213 (2015) (citation omitted). *See generally Shao v. City Univ. of N.Y.*, No. 12

Civ. 1566, 2014 WL 5038389, at *5 (S.D.N.Y. Sept. 30, 2014) ("The Second Circuit has noted

---

qualifications with his exemption request.  And UCS's later request to reinstate DeMaria, JSF
¶¶ 31–32, bespeaks that he remained qualified for his job.

that 'direct evidence' would roughly equate to a 'smoking gun' indicating that a plaintiff's firing

was discriminatory." (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1237, 1239

(2d Cir. 1995), and *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir. 1992))).

DeMaria has not adduced any direct evidence of discriminatory intent.  He has not

pointed to any remark or action indicative of "a discriminatory attitude," *Venezia*, 2015 WL

5692146, at *3, or any "workplace policy, practice, or decision" based on a protected

characteristic, *Young*, 575 U.S. at 213.

DeMaria argues that defendants' vaccine exemption committee was in some manner

discriminatory based on its lawyer-heavy composition.  *See* Pl. Opp. Br. at 22–23.  He draws on

Barry's testimony to allege that the Committee "received guidance from in-house counsel on

how to most effectively legally challenge the religious 'sincerity' of religious exemption

applicants.'"  *Id.* at 22 (citing Barry Depo. at 57, 66).  DeMaria thus surmises that the Committee

was staffed "with the intent to scrutinize" unfairly the sincerity of religious objections, and "deny

the request if at all possible."  *Id.* at 2.

That argument is entirely speculative.  It is unsupported by any evidence.  And the

admissible evidence reflects the contrary:  Although the Committee that denied DeMaria's

exemption request was comprised of six lawyers and two non-lawyers, JSF ¶ 23, the Committee

overall granted numerous religious exemptions—indeed, many more than medical exemptions.

Of the 694 total exemptions, Barry attested, the Committee granted 130 medical exemptions out

of 338 medical exemption requests (an approval rate of 38%), and 564 religious exemptions out

of 947 religious exemption requests (an approval rate of 60%).  Barry Decl. ¶ 47.  And Barry set

out a neutral explanation for the Committee's inclusion of numerous lawyers.  The Committee,

he testified, benefited from the participation of persons "with experience in the law surrounding

accommodations for the Americans with Disabilities Act," and who could "apply the law related to exemptions." Barry Depo. at 64–65. He further testified that religious background did not play any role in determining the Committee's membership. *Id.* at 64. DeMaria does not point to any contrary evidence. And his suppositions solely based on committee makeup are insufficient to support an inference of discriminatory intent. *See Nguedi v. Fed. Rsrv. Bank of N.Y.*, 813 F. App'x 616, 617 (2d Cir. 2020) ("A party cannot defeat a motion for summary judgment with mere speculation and conclusory assertions." (citation omitted)); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (non-moving party "may not rely on conclusory allegations or unsubstantiated speculation" to survive summary judgment (citation omitted)); *cf. Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 406 (E.D.N.Y. 2018) ("[T]he racial makeup of a decision making body is insufficient standing alone to raise an inference of discrimination[.]" (citing *Howard v. City of New York*, 602 F. App'x 545, 548 (2d Cir. 2015))).

DeMaria also fails to adduce indirect evidence of discriminatory intent.

He first argues that he was treated less favorably than another employee who received an exemption. To qualify as a viable comparator, such a person must be outside the plaintiff's protected group and similarly situated "in all material respects." *Ruiz*, 609 F.3d at 494 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (employees are similarly situated if they "were subject to the same performance evaluation and discipline standards" and "engaged in comparable conduct" (citation omitted)).

The one comparator DeMaria identifies—Marzena Wierzynska, another senior court clerk—fails that standard at the threshold because she, like DeMaria, is Christian, and thus falls within DeMaria's protected class. JSF ¶ 34; *see also* 6/17/2025 Oral Arg. Tr. at 23–24

27

(DeMaria's counsel, stating that DeMaria's disparate treatment claim alleges discrimination against a protected class of "religious" persons in comparison to "non-religious" persons). And, even if Wierzynska had been outside DeMaria's protected class, the facts adduced reflect that the two were not similarly situated in all material respects. DeMaria notes that Wierzynska received a religious exemption after "provid[ing] additional information" in a supplemental affidavit. JSF ¶¶ 35–38. But the nature of that information matters. DeMaria does not indicate that Wierzynska's supplemental information was comparable to the curious notation he added— "not if similar circumstances were present"—which, along with DeMaria's continued use of products derived from fetal cell line testing, supplied a basis on which the Committee could deny his exemption request. *See, e.g.*, *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 312 (E.D.N.Y. 2014) (granting summary judgment for defendants where plaintiff "asserts only that the two comparators shared the same job title as him, but offers no additional evidence that they were similarly situated in terms of performance, evaluation or discipline standards, or that they engaged in comparable conduct"), *aff'd*, 594 F. App'x 29 (2d Cir. 2015); *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 21 (2d Cir. 2013) (affirming summary judgment for defendants where plaintiff provided "no factual support that a single alleged comparator performed similar job functions, was subjected to the same disciplinary standards, engaged in similar conduct, or was treated more favorably" (citation omitted)). *See generally Fletcher v. ABM Bldg. Value*, No. 14 Civ. 4712, 2018 WL 1801310, at *13 (S.D.N.Y. Mar. 28, 2018) ("It is not sufficient to show that plaintiff and her comparators shared the same job title." (citation omitted)), *aff'd*, 775 F. App'x 8 (2d Cir. 2019).

DeMaria next argues that the Committee's supplemental affidavit request to him was unduly probing, and this deviation from its standard procedure bespoke discriminatory intent.

*See* Pl. Opp. Br. at 23–24; *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 274 (2d Cir. 2023).
But that is entirely speculative. DeMaria has not shown that the supplemental affidavit requested
from him was materially different from those sought from others. And Barry testified to the
contrary, stating that, apart from "one or two" religious exemption requests, which were "granted
or denied solely on the applicant's initial form," the Committee sent the same supplemental
affidavit to "hundreds" of applicants who had raised religious objections, with the differences
limited to the sections the particular applicant was instructed to complete. Barry Depo. at 84.
For example, depending on the circumstances, some applicants were asked to complete
"Section A" ("their prior, current, and future use of specific prescription and over-the-counter
drugs and vaccines that also used the HEK-293 cell line"); some, "Section B" ("beliefs about the
sanctity or purity of his or her own body"); and some, both. Barry Decl. ¶¶ 38–39. As Mindy
Jeng, a non-voting member of the Committee who served as its counsel, attested—and as
DeMaria's completed supplemental affidavit confirmed—DeMaria was required to complete
Section A. Jeng Decl. ¶ 34; 5/6/22 Pl. Supp. Aff. at 1–4. But DeMaria does not explain why
requiring him to do that in light of his odd handwritten qualification was a deviation from
procedure or otherwise unjustified. His threadbare claim to this effect does not support an
inference of discriminatory intent. *See Banks*, 81 F.4th at 274; *see also, e.g.*, *Bonilla v. City of
New York*, No. 22 Civ. 7113, 2023 WL 8372859, at *5 (S.D.N.Y. Dec. 4, 2023) (panel's
"additional questioning" of a plaintiff who objected to fetal cell–based vaccines, specifically
about her "use of other medications and vaccines," was a "permissible" assessment of her
beliefs); *Mora v. N.Y. State Unified Ct. Sys.*, No. 22 Civ. 10322, 2023 WL 6126486, at *11
(S.D.N.Y. Sept. 19, 2023) ("supplemental form ask[ing] applicants to support their professed
religious beliefs by describing their prior and anticipated conduct respecting medicines and

vaccines . . . did 'not presuppose the illegitimacy' of plaintiff's articulated religious beliefs, but 'merely [sought] to determine whether such concerns are the applicant's true motivation for seeking an exemption'" (citation omitted)); *Ferrelli v. N.Y. Unified Ct. Sys.*, No. 22 Civ. 68, 2022 WL 673863, at *8 (N.D.N.Y. Mar. 7, 2022) (same).

Because DeMaria has not adduced evidence supporting an inference of discriminatory intent, summary judgment for the defense is warranted on his Title VII disparate treatment claim. *See, e.g.*, *Connaughton v. Mount Vernon City Sch. Dist.*, No. 21 Civ. 692, 2024 WL 1702148, at *6–7 (S.D.N.Y. Apr. 18, 2024) (granting summary judgment for defendant on Title VII disparate treatment claim where plaintiff "failed to identify" a similarly situated employee outside plaintiff's protected class, "let alone demonstrate how they were similarly situated"), *appeal withdrawn*, No. 24-1410, 2024 WL 4827379 (2d Cir. Sept. 30, 2024); *Noble v. Career Educ. Corp.*, No. 7 Civ. 5832, 2009 WL 2391864, at *9 (S.D.N.Y. Aug. 4, 2009) (granting summary judgment for defendant where plaintiff failed to show he was "similarly situated" to, and "treated disparately from," a comparator, and thus "failed to make out a prima facie case of discrimination" under Title VII), *aff'd*, 375 F. App'x 102 (2d Cir. 2010).

### 3. Legitimate Non-Discriminatory Basis for Termination

Defendants argue that, even had DeMaria made out a prima facie case, the evidence would then supply, without refutation, a legitimate, nondiscriminatory reason for his termination—namely, that DeMaria did not comply with the Vaccine Mandate after his exemption request was denied. *See* Defs. Br. at 16–18. DeMaria responds that a genuine issue of material fact exists as to whether this stated reason was pretextual. *See* Pl. Opp. Br. at 12. His sole argument for so claiming, however, is the one rejected above as factually baseless, to wit, that the Committee's lawyer-heavy staffing bespoke an intention to deny religious exemptions wherever possible.

Summary judgment is merited for the defense on this basis as well. The undisputed facts supply a legitimate nondiscriminatory basis for terminating DeMaria's employment: He refused to comply with the Vaccine Mandate despite ample opportunity to do so. After denying his request for a religious exemption, UCS directed DeMaria to submit proof of vaccination by July 8, 2022. JSF ¶ 21. He did not do so. *Id.* ¶ 24. On July 12, 2022, UCS extended DeMaria's deadline to submit proof of vaccination until July 26, 2022. *Id.* ¶ 26. DeMaria again failed to do so. *Id.* ¶ 26. On August 4, 2022, UCS terminated his employment, in accord with its written policy. *Id.* ¶ 27; Barry Decl. ¶¶ 27–28. DeMaria does not dispute that he did not provide proof of vaccination or that UCS's policy required his termination under those circumstances. JSF ¶¶ 21–27. And for the reasons above, DeMaria's sole basis to claim pretext, based on the Committee's composition, is factually unsupported. A reasonable juror thus could only find that UCS had a valid and non-pretextual basis for terminating him. *See, e.g.*, *French v. Albany Med. Ctr.*, No. 22 Civ. 252, 2024 WL 2958461, at *20 (N.D.N.Y. June 12, 2024) (granting defendant summary judgment on Title VII discrimination and retaliation claims where employer had "a legitimate, nondiscriminatory, and nonretaliatory reason for terminating [p]laintiff," who "did not comply with the mandatory vaccination requirement"); *Smith v. St. Joseph's Med. Ctr.*, No. 22 Civ. 5231, 2024 WL 2058619, at *4 (S.D.N.Y. May 7, 2024) (granting defendants summary judgment on plaintiff's Title VII religious discrimination claim because they provided "a legitimate, non-discriminatory reason for plaintiff's termination," and previously told her that "she was required to be vaccinated by law[,] and that she could not continue working . . . if she did not comply").

Accordingly, the Court grants summary judgment for defendants on the Title VII disparate treatment claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the parties' motions for summary judgment.  As to the failure to accommodate claim, the Court grants DeMaria's partial motion on the issue of undue hardship and otherwise denies the parties' cross-motions. As to the disparate treatment claim, the Court grants defendants' motion for summary judgment.

The Clerk of Court is respectfully directed to close the motions pending at Dockets 58, 63, and 66.  This case will now proceed to trial.  An order will issue shortly setting a deadline for the parties' joint pretrial order, including deadlines for motions *in limine* and oppositions, and requesting the parties' availability for a fall 2025 trial, consistent with the Court's Individual Rules governing jury trials.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 8, 2025
New York, New York

32